UNITED STATES of America, Appellee,

v.

Hosea WILLIAMS, Appellant.

No. 89–3022.

United States Court of Appeals, Eighth Circuit.

Submitted Aug. 28, 1990.

Decided Oct. 26, 1990.

Rehearing Denied Jan. 7, 1991.

Nathan S. Cohen, St. Louis, Mo., for appellant.

Steven Holtshouser, Asst. U.S. Atty., St. Louis, Mo., for appellee.

Before BOWMAN, WOLLMAN and BEAM, Circuit Judges.

BEAM, Circuit Judge.

Following the district court's denial of his pretrial motion to suppress evidence seized pursuant to a warrant, Hosea Williams entered a conditional plea of guilty to two counts of a four count indictment. Williams pleaded guilty to count one, which charged him with possession of cocaine with intent to distribute on May 9, 1989, and to count three, which charged the same offense on April 19, 1989, both in violation of 21 U.S.C. § 841(a)(1) (1988). In support of his motion to suppress, Williams argued to the district court that the warrant which authorized the April 19 search

was invalid because it identified the place to be searched, a residence at 5829 Cates in St. Louis, as a single-family dwelling instead of what it in fact was—a rooming house. Williams also argued that even if the warrant were valid, the method of its execution violated the fourth amendment because the officers should have realized during their search that the warrant was in fact overbroad. The district court, however, found no fourth amendment violation and denied the motion to suppress. The sole issue presented on appeal is whether the district court erred in denying Williams's motion to suppress. We affirm.

## I. BACKGROUND

The investigation which culminated in the arrest of Williams and the seizure of evidence from his room at 5829 Cates began on March 30, 1989. At that time, Detective Keith Hicks, an undercover officer in the narcotics division of the St. Louis Metropolitan Police Department, received information from a confidential informant that Darryl Small and others were selling cocaine out of the residence at 5829 Cates. The confidential informant told Hicks that the house was an older, three-story brick structure, owned by Small's father, Latrelle Campbell. The informant also told Hicks that, while Campbell was in jail awaiting trial on a murder charge, Small was occupying the house in common with friends who were selling cocaine for him. Armed with this information, Hicks and the informant made purchases of cocaine at 5829 Cates on six different occasions—April 3, 4, 10, 11, 12 and 14. On April 18, 1989, the informant told Hicks that he had purchased cocaine from Small earlier that day and that Small had several bags of cocaine at the house. On April 19, 1989, Hicks executed a warrant, dated April 18, 1989, authorizing the search of "5829 Cates[,] a three story single family residence."

Hicks was accompanied by, among others, Detective Stephen Strehl, who was in charge of the search and seizure. After forcing the front door, the officers searched all three floors of the house. The officers found Williams, currency and co-

caine in the second-floor southwest bedroom. Williams identified, as his, the room, which was marked by a number four on the door, and which had its own bathroom and a full-size stove and refrigerator. Williams was arrested and released on bond. A second warrant, specifically authorizing the search of Williams's room, "the 2nd floor southwest bedroom of 5829 Cates," was obtained and executed on May 9, 1989. Again after forcing the front door, the officers proceeded directly to the southwest bedroom, where they found Williams, cocaine and a semi-automatic weapon.

In support of his motion to suppress, Williams argued that the first search of his room on April 19, 1989, violated the fourth amendment because the warrant did not describe with sufficient particularity the place to be searched. That is, the warrant authorized the search of the entire house as a single-family dwelling when in fact the house was being used as a rooming house, the occupants of which maintained a reasonable expectation of privacy in their own rooms. The motion was initially considered by a United States Magistrate, who held a pretrial hearing on June 28, 1989. At the hearing, Detective Strehl testified to the facts surrounding the execution of both warrants. Ronald Richardson, a private investigator hired by Williams to investigate the physical features of 5829 Cates, testified about the house from a videotape of the premises he had taken. Richardson concluded that the residence was not a single-family dwelling. Finally, Williams testified that he paid $140 per month rent for his room, that it had two deadbolt locks on the door, which was numbered, and that it had a full-size stove and refrigerator, although no kitchen sink.

The magistrate recommended on July 24, 1989, that the motion to suppress be denied. His report and recommendation was adopted by the district court on August 9, 1989. On August 14, however, the district court granted Williams's motion to reconsider its ruling as well as the government's motion to present additional evidence. Thus, the district court held a second hear-

ing at which Strehl, Hicks and Williams testified. After hearing this additional testimony, listening to the audiotape of the first hearing before the magistrate, and viewing several photographs of the residence and the videotape made by Richardson, the district court again denied the motion. It found that the warrant was valid when issued because the officers at that time had a reasonable belief that the residence was a single-family dwelling. The court also held that the officers did not violate the fourth amendment during the execution of the April 18 warrant because they did not reasonably believe, during the search, that 5829 Cates was other than a single-family dwelling, occupied by Small in common with friends. On appeal, Williams argues that the district court erred on both counts.

## II. DISCUSSION

■ In *Maryland v. Garrison*, 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987), the Supreme Court considered the validity of a warrant authorizing the search of Lawrence McWebb and his apartment, "the premises known as 2036 Park Avenue third floor apartment." *Id.* at 80, 107 S.Ct. at 1015. When the officers applied for the warrant, they reasonably believed that McWebb's apartment occupied the entire third floor; in fact, the third floor was divided into two apartments, one of which was occupied by Garrison. The officers entered and began searching Garrison's apartment, reasonably believing it to be McWebb's, before they discovered that the third floor in fact contained two apartments. At that point, they discontinued their search. The Supreme Court held that the search presented "two separate constitutional issues, one concerning the validity of the warrant and the other concerning the reasonableness of the manner in which it was executed." *Id.* at 84, 107 S.Ct. at 1017. As did the Supreme Court in *Garrison*, we begin by considering whether the officers' factual mistake concerning the physical layout of 5829 Cates invalidated the warrant.

Williams does not argue that there was no probable cause to believe that Small was selling cocaine from 5829 Cates. Rather, as in *Garrison*, he argues that "the description of [the place to be searched] was broader than appropriate because it was based on the mistaken belief" that 5829 Cates was a single-family dwelling occupied by Small in common with others. *Id.* at 85, 107 S.Ct. at 1017. While Darryl Small was the focus of their investigation, June 28 hearing transcript at 20, 30, the officers in this case intended to search the entire house at 5829 Cates, which they believed was occupied by Small *en toto*. *Garrison* indicates that this factual mistake would invalidate the warrant "if the officers had known, or even if they should have known" of the true character of 5829 Cates. *Garrison*, 480 U.S. at 85, 107 S.Ct. at 1017. Thus, Williams argues that, given the facts available to the officers at the time they applied for the warrant, they could not reasonably have believed that 5829 Cates was in fact a single-family dwelling.

We must judge the constitutionality of the officers' conduct, and hence the validity of the warrant, "in light of the information available to them at the time they acted." *Id.* See also *United States v. Johnson*, 904 F.2d 443, 446 (8th Cir.1990). We must examine those facts known to the officers when they applied for the warrant. "Those items of evidence that emerge after the warrant is issued have no bearing on whether or not a warrant was validly issued." *Garrison*, 480 U.S. at 85, 107 S.Ct. at 1017. Rather, the "validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate." *Id.* We review the district court's denial of the motion to suppress under a clearly erroneous standard of review. *United States v. Boucher*, 909 F.2d 1170, 1173 (8th Cir.1990), *petition for cert. filed*, Sept. 24, 1990 ("We will affirm a district court's order denying a motion to suppress unless we find that the decision is unsupported by the evidence, based on an erroneous interpretation of the

law, or we are left with a firm conviction that a mistake has been made.").

Williams relies on a number of different facts to support his argument that the officers could not reasonably have believed that 5829 Cates was a single-family dwelling when they applied for the warrant. As indicated, we consider those facts known to the officers when they applied for the warrant. First, Williams produced photographs and the videotape made by Richardson that showed seven doorbells, numbered one through seven, next to the front door. June 28 Hearing Transcript at 24, 35. Similarly, Williams points to numbers and deadbolt locks on the room doors as signs of individual units. *Id.* at 36, 44. Richardson testified that each number "was approximately two and a half to three inches in length and it was above the top of the door." *Id.* at 36. Finally, Williams points out that the second floor landing could be closed off by a fire door at the top of the stairs, a sure sign, he argues, of a rooming house. *Id.* at 35–36.

The government argues that none of these facts precluded the agents from reasonably believing that the house was a single-family dwelling. Strehl and Hicks both testified that Hicks, in the six visits he made to the house, was never allowed past the front foyer. June 28 Hearing Transcript at 31; August 14 Hearing Transcript at 7, 26. Accordingly, Hicks testified that he did not notice either numbers on the doors, August 14 hearing transcript at 11, or the doorbells. *Id.* at 7–8. As to the doorbells, Hicks testified that his first and second visits were made at night; that on the first occasion the door was opened before he got to it; and that on the second he simply knocked. *Id.* at 23–24. Strehl similarly testified that when he executed the April 18 warrant, he did not notice the doorbells. *Id.* at 31. Because he was not admitted into the house beyond the foyer, Hicks also testified that he could not see the fire door or anything else on the second floor, *id.* at 21, and Williams himself corroborated this testimony. *Id.* at 53. Finally, Hicks testified that prior to applying for

a warrant, he checked to see in whose name the gas and electricity were registered, and found that one was in the name of Latrelle Campbell, Small's father, and the other in the name of Rosa Delaney, Small's grandmother. *Id.* at 27–28.

The district court credited the testimony of the officers, and its findings and reasons for denying the motion to suppress are extensive and explicit. After listening to the evidence presented at the August 14 hearing, the district court listened to the audiotape of the hearing before the magistrate and viewed the videotape made by Richardson. *Id.* at 76. As to the numbers on the doors, the district court found from several photographs in evidence that the number on Williams's room, number four, was "placed at the extreme top of the door," *id.* at 77, and that it "could be quite easily overlooked." *Id.* at 78. Moreover, after viewing the videotape twice, the district court indicated that "I didn't see any numbers in the videotape either on any of those doors [on the first floor, visible from the foyer]." *Id.* at 82. Thus, given that the numbers were difficult to see and that the house had a common driveway, entrance and mailbox, the district court thought that the only indicia of a rooming house were the doorbells. *Id.*

The district court found that they, too, were difficult to see. After describing the physical proximity of the doorbells to the door (they were not immediately next to the door), the court noted that they were in shadows even in daylight. *Id.* at 78–79. Because Hicks first visited the house at night and did not even need to knock the first time, the court found it reasonable that he did not see the doorbells. *Id.* at 79. As to the other visits, the court found it reasonable that Hicks would simply knock on the door.

> He walked right up, didn't look for a bell, knocked on the door, was ushered right in, he says he never looked for bells, he never saw those bells. And if you look at the physical facts, again it would not be something that would be extremely

incredible that you wouldn't see them. In fact, it would be very credible that under the circumstances, the way they are located, that you would not see them. *Id.* at 79–80. Thus, the district court found that the officers reasonably believed at the time they applied for a warrant that 5829 Cates was a single-family dwelling. We do not think that this finding is clearly erroneous.[1]

██ Review of Williams's second argument, that the officers should have stopped their search when they realized that the house contained individual apartments and was not a single-family dwelling, turns on a similar inquiry. The Supreme Court indicated in *Garrison* that "the validity of the search of respondent's apartment pursuant to a warrant ... depends on whether the officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable." *Garrison,* 480 U.S. at 88, 107 S.Ct. at 1019. The reasonableness of their conduct turns on facts noticed by the officers during their search that they did not know before. "It is only after the police begin to execute the warrant and set foot upon the described premises that they will discover the factual mistake and must reasonably limit their search accordingly." *Id.* at 89 n. 14, 107 S.Ct. at 1019 n. 14. In other words, we must inquire whether the officers should have realized their factual mistake during their search and ended the investigation of the premises.

In making this inquiry, the district court found especially troublesome the fact that several of the apartments contained full-size stoves and refrigerators. June 28 Hearing Transcript at 25, 36; August 14 Hearing Transcript at 42. The court went

on to hold, however, that these appliances alone were not enough to make the officers' failure to realize that they were searching a boarding house with individual rooms unreasonable. Considering that several officers searched the house at once, with teams of officers on each floor, August 14 hearing transcript at 85, and that the evidence did not indicate that all the rooms contained full-size appliances, *id.* at 62–63, the district court did not find it unusual that the officers, in the haste of their search, failed either to notice the appliances or to consider their implication. *Id.* at 85. As is proper, the district court allowed "some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants." *Garrison,* 480 U.S. at 87, 107 S.Ct. at 1018. Unlike *Garrison,* in which the officers clearly were confronted with two apartments where they expected to find only one, nothing in this case should have made it obvious to the officers that the warrant was overbroad. We find no error in the district court's conclusion that the officers' failure to realize that the warrant contained a factual mistake was objectively reasonable.

## III. CONCLUSION

Williams obtained a thorough and searching review of his fourth amendment arguments from the district court and we are impressed by the care with which the court conducted its inquiry. After our review of the record, we find no error in the district court's denial of the motion to suppress. Accordingly, we find no merit in Williams's argument that the warrant executed on May 9, 1989, was invalid because it was obtained in part from information seized

---

1. In *United States v. Davis,* 557 F.2d 1239 (8th Cir.1977), this court considered the validity of a warrant issued for a single-family residence which later turned out to include separate residences. We rejected appellant's argument "that just because there were several buzzers on the outside of the main entrance, officers should have known it was a multiple residence. This is not necessarily true since the officers' information indicated past tenants had left." *Id.* at 1248

n. 8. Because the district court found in this case that the officers did not see the doorbells, we need not consider a similar argument in this case. But even if the officers had noticed the doorbells, given the information from the confidential informant that Small occupied the house in common with friends, we do not think that the presence of the doorbells would be dispositive.

pursuant to the first warrant. The judgment of the district court is affirmed.